******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

## SANTOS CANCEL *v*. COMMISSIONER
## OF CORRECTION
## (AC 40977)

Keller, Prescott and Harper, Js.

*Syllabus*

The petitioner, who had been convicted of sexual assault in the fourth degree and risk of injury to a child, sought of a writ of habeas corpus, claiming that his trial counsel had rendered ineffective assistance by failing, inter alia, to attend his presentence investigation interview with a probation officer. The petitioner claimed that his counsel's absence from the interview constituted deficient performance and that he was prejudiced by her absence because he made harmful comments during the interview that his counsel, if present, would have advised him not to make and which adversely affected the subsequent sentence he received from the trial court. The petitioner further claimed that because the presentence investigation interview was a critical stage of the proceedings and that his counsel's absence constituted a complete denial of his sixth amendment right to effective assistance of counsel, the trial court should have applied the presumption of prejudice under *United States* v. *Cronic* (466 U.S. 648) that arises when the denial of sixth amendment rights makes the adversary process itself presumptively unreliable. The petitioner had been charged in separate informations, which were joined for trial, in connection with incidents that involved two minors, J and G. At the habeas trial, a forensic psychologist, E, who had reviewed a forensic interview of J, who had developmental issues, testified about the potential for suggestibility in J's forensic interview, but made no determination about J's level of suggestibility or that the forensic interview was improperly conducted. The habeas court rendered judgment denying the habeas petition, concluding, inter alia, that, under *Strickland* v. *Washington* (466 U.S. 668), the petitioner's trial counsel did not render deficient performance as a result of her absence from the presentence investigation interview and that the petitioner failed to prove that he was prejudiced thereby. The court further concluded that the petitioner failed to prove that his trial counsel's representation was deficient as to his other claims of ineffective assistance or that he was prejudiced by any aspect of her allegedly deficient performance. Thereafter, the habeas court granted the petition for certification to appeal, and the petitioner appealed to this court. *Held*:

1. The petitioner could not prevail on his claim that the habeas court erred in concluding that he was not prejudiced by his trial counsel's failure to litigate whether the two underlying criminal cases against him should have been joined for trial: the evidence in both cases was cross admissible, as the crimes involving J and G were not too remote in time, the petitioner was accused of committing the same crimes in the same manner and location in both cases, with the exception of one charge of which he was found not guilty, because of the similarity of the evidence in both cases, evidence from one case that may have been introduced in the other would have been unlikely to arouse the jurors' emotions, and even if the cases had not been joined, the evidence in one case would have been cross admissible in the other case to prove that the petitioner had a propensity or tendency to sexually assault adolescent girls; moreover, the petitioner's claim that he had a compelling need to testify in the case involving G but not in the case involving J was unavailing, as his testimony in G's case similarly would have been needed in J's case, and because the evidence was cross admissible, there was no reasonable probability that an objection to joinder would have changed the outcome of his criminal trial or that his convictions would have been reversed on direct appeal.

2. The petitioner failed to demonstrate that the habeas court erred in concluding that he was not prejudiced by his trial counsel's failure to object to the opinion testimony of K, a detective, that G was a victim of sexual assault: there was no reasonable probability that, had trial counsel successfully objected to K's testimony, the result of the criminal trial would

have been different, as there was overwhelming evidence apart from K's testimony from which the jury reasonably could have concluded that the petitioner sexually assaulted G, including statements that J and G had made to the police, the videotape of J's forensic interview, DNA analysis that revealed the presence of the petitioner's semen on G's underwear and clothing, which contained holes that had been cut between the rear end and genital area, and testimony from J that indicated that there were holes in her underwear; moreover, even if the cases had not been joined, the evidence in both cases was cross admissible as evidence that the petitioner had a propensity to engage in the sexual conduct with which he was charged.

3. The habeas court properly concluded that the petitioner's trial counsel did not render deficient performance by deciding not to present testimony from an expert in forensic psychology regarding the suggestive influence that may have been present in J's forensic interview: trial counsel was aware of J's developmental issues and the role that suggestibility could have in child sexual assault cases, and determined, after she reviewed the videotape of the forensic interview several times and found no suggestibility in the forensic interview, that there was no legitimate reason to retain an expert or to pursue a suggestibility defense strategy because of the overwhelming evidence against the petitioner; moreover, E did not make a determination that J was influenced during the forensic interview or that the forensic interview was improperly conducted, the information obtained from the forensic interview was consistent with information that K had obtained from other witnesses, and the forensic interview conformed to guidelines specified by the police and was conducted in an impartial manner by an expert in child sexual assault interviews.

4. The petitioner could not prevail on his claim that his trial counsel's absence from the presentence investigation interview constituted a complete denial of his sixth amendment right to the effective assistance of counsel that warranted a presumption of prejudice under *Cronic*: although the habeas court determined under *Strickland* that the petitioner's right to counsel was not violated, this court concluded that his sixth amendment right to counsel was not violated on the alternative ground that he was not entitled to effective assistance of counsel at his presentence investigation interview because a presentence investigation interview is not a critical stage of a criminal proceeding to which the right to counsel applies, as trial courts in Connecticut, which exercise broad, independent discretion in imposing a sentence, enlist the aid of probation officers to investigate and make a report prior to sentencing, and the probation officer, thus, is an extension of the court and not an agent of the government, and because a proceeding must be adversarial in nature to be considered a critical stage, the right to counsel at a critical stage does not extend to nonadversarial proceedings; accordingly, prejudice under *Cronic* could not be presumed as a result of trial counsel's absence from the petitioner's presentence investigation interview.

Argued January 31—officially released May 7, 2019

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Oliver, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Vishal K. Garg*, assigned counsel, with whom, on the brief, was *Desmond M. Ryan*, for the appellant (petitioner).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Marc G. Ramia*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

HARPER, J. The petitioner, Santos Cancel, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court erred in concluding that his trial counsel had not provided ineffective assistance by failing (1) to litigate adequately the issue of whether the two underlying criminal cases against the petitioner should have been joined for trial, (2) to object to opinion testimony from a witness on an ultimate issue of fact with respect to the criminal charges in one of the underlying cases, (3) to present expert testimony that could have offered an alternative innocent explanation for the sexual assault allegations against the petitioner, and (4) to attend the petitioner's presentence investigation interview with a probation officer. We affirm the judgment of the habeas court.

The following facts and procedural history are relevant to our resolution of this appeal. The petitioner was charged in two cases alleging sexual assault that were joined for trial. After a jury trial, the petitioner was convicted, in both cases, of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A), and risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and (2). This court's opinion in the petitioner's direct appeal in *State* v. *Cancel*, 149 Conn. App. 86, 87 A.3d 618, cert. denied, 311 Conn. 954, 97 A.3d 985 (2014), sets forth the following facts:

"The jury reasonably could have found the following facts with respect to the charges in the first case, which involved the victim, J.[1] J was eleven years of age in February, 2009, and resided with her uncle. J's mother resided with the [petitioner] and three of J's maternal siblings, all minors, in a nearby city. Sometime in February, 2009, J went to her mother's residence for an overnight visit. J's mother, the [petitioner], and the three other children were present in the residence during J's stay. On the night of her visit, J went to sleep in her sisters' room, where she shared a bed with two of her siblings. J later awoke to find the [petitioner] sitting on the floor touching her 'front private area.' When the [petitioner] realized that J was awake, he apologized to her. J's mother then called for the [petitioner], prompting him to leave the room. Later that night, the [petitioner] returned to the bedroom. He woke J and instructed her to go to another bedroom in the residence. J proceeded to go into the other bedroom, alone, and went back to sleep. The [petitioner] then entered the other bedroom. He shut the door, positioned himself on top of J and 'went up and down.' The [petitioner] then cut a hole in J's underwear and initiated sexual contact with J's intimate areas. Following her encounter with the [petitioner], J went into the bathroom and felt a 'wet' sensation in and around her intimate parts.

"The next day, J returned to her uncle's home crying and ostensibly nervous. Sometime later, J told her uncle's girlfriend that she was having 'a problem.' J explained how the [petitioner] had 'told her to go to sleep and to lay . . . face down,' and how he had cut her pants. J also told her uncle that the [petitioner] had tried to 'abuse her' the night she stayed at her mother's home. J's uncle subsequently contacted the social worker at J's school. The social worker met with J, and J explained what occurred on the night she stayed at her mother's residence. After meeting with J, the social worker reported the incident to the Department of Children and Families (department). The department, in turn, contacted the police. Thereafter, J and her uncle went to the police station where J explained to the police how the [petitioner] had made inappropriate contact with her on the night she stayed at her mother's residence. The police subsequently initiated an investigation into the incident and sought out J's mother and the [petitioner] for questioning. When the police arrived at the mother's residence, the [petitioner] ran out the back door. J's mother, however, agreed to accompany the police to the station for questioning. During questioning, J's mother indicated that during J's most recent visit, J had told her that she woke up with holes in her underwear. J's mother also indicated that one of her other daughters had reported waking up with holes in her underwear on several occasions.

"The jury reasonably could have found the following facts with respect to the charges in the second case, involving the victim, G. G was ten years of age in February, 2009, and one of J's siblings. G lived with her mother and the [petitioner] on a permanent basis. After speaking to her mother in connection with J, the police questioned G. G told the police that on certain nights, the [petitioner] would come into her room and tell her to change her sleeping position. In the mornings that followed the [petitioner's] nighttime visits, G woke up to find holes in her underwear and pants, always in the vicinity of her intimate areas. These holes were never present when she went to sleep, but appeared after she woke up the next morning. She was uncertain of what caused the holes to appear, but believed that her cat caused the holes in her clothing because her cat previously had ripped holes in her sister's clothing. She explained that the holes in her clothing appeared only during the time the [petitioner] lived in the residence. She usually would give the underwear to her mother so she could mend them or throw them away. G revealed to police that she was wearing a pair of the mended underwear during questioning and that the dresser at her mother's residence contained many pairs of the underwear that still had holes in them or had been mended by her mother. With the mother's permission, the police took possession of the underwear G wore at the time of questioning. The police subsequently

obtained and executed a search warrant on the mother's residence. During the search, the police seized twelve additional pairs of underwear and two pairs of pants that either had holes in them or appeared to have been mended. In addition, the police seized two pairs of scissors. The thirteen pairs of underwear and two pants seized by the police subsequently were submitted for forensic analysis. The forensic analysis of the clothing revealed that the two pants and six out of the thirteen pairs of underwear had holes consistent with being cut by a sharp blade, not ripped. The holes in each item were located between the rear end and genital area. DNA analysis revealed that the [petitioner's] semen was present on the inside and outside of three pairs of G's underwear and one pair of her pants. The [petitioner] could not be eliminated as the source of semen present on another pair of underwear.

"The [petitioner] was arrested on March 5, 2009.[2] With respect to J's case, the state, in a substitute information, charged the [petitioner] with one count of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (2), one count of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A), and two counts of risk of injury to a child in violation of § 53-21 (a) (1) and (2). With respect to G's case, the state, in a substitute information, charged the [petitioner] with one count of sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A), and two counts of risk of injury to a child in violation of § 53-21 (a) (1) and (2).

"Before trial commenced, the state moved for a consolidated trial on the charges in both cases. The court granted the motion after defense counsel raised no objection. At the conclusion of evidence, the jury found the [petitioner] not guilty of attempt to commit sexual assault in the first degree, but guilty on each of the remaining charges in J's case. The jury found the [petitioner] guilty of all charges in G's case. The court sentenced the [petitioner] to a total effective term of thirty years of imprisonment." (Footnotes in original.) Id., 88–91. This court affirmed the petitioner's convictions on direct appeal. See id., 103.

On July 31, 2014, the petitioner, in a self-represented capacity, filed a petition for a writ of habeas corpus. On October 12, 2016, the petitioner, represented by counsel, filed the operative amended petition. In the amended petition, the petitioner alleged that Attorney Tina Sypek D'Amato rendered ineffective assistance by failing (1) to adequately investigate, research, and educate herself about the issues unique to child sexual assault cases; (2) to object to the joinder of the two cases for trial; (3) to consult with an expert and present a suggestibility defense or an alternative innocent explanation as supported by expert testimony; (4) to object to testimony from Detective Cathleen Knapp that, in

her opinion, G was a victim of sexual assault; (5) to attend the petitioner's presentence investigation interview; (6) to adequately cross-examine, impeach, or otherwise challenge the testimony of J, G, or their uncle; (7) to adequately pursue the production and disclosure of confidential and privileged materials related to J; and (8) to present evidence of a custody dispute between J's mother and J's uncle.

By memorandum of decision issued on August 17, 2017, the habeas court denied the amended petition, concluding that the petitioner did not meet his burden of establishing either deficient performance or prejudice with respect to his first, third, fifth, sixth, seventh, and eighth claims of his operative amended complaint. The court additionally concluded, without determining that deficient performance had been rendered by Attorney D'Amato, that the petitioner did not meet his burden of establishing prejudice as to his second and fourth claims. On August 31, 2017, the court granted the petitioner's petition for certification to appeal from its decision. This appeal followed.[3] Additional facts will be set forth as necessary.

We begin by setting forth the relevant legal principles and our well settled standard of review governing ineffective assistance of counsel claims. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, 158 Conn. App. 431, 437, 119 A.3d 607 (2015); see also *Buie* v. *Commissioner of Correction*, 187 Conn. App. 414, 417, 202 A.3d 453, cert. denied, 331 Conn. 905, 202 A.3d 373 (2019).

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). . . . In *Strickland* . . . the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . .

"To satisfy the performance prong [of the *Strickland*

test] the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . .

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Citations omitted; internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, supra, 158 Conn. App. 437–38; see also *Holloway* v. *Commissioner of Correction*, 145 Conn. App. 353, 364–65, 77 A.3d 777 (2013).

Finally, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland* v. *Washington*, supra, 466 U.S. 697. Guided by these principles, we turn to the specific claims made by the petitioner.

I

We first address the petitioner's claim that the habeas court erred in concluding that he was not prejudiced by his trial counsel's alleged failure to litigate adequately the issue of whether the two underlying criminal cases against the petitioner should have been joined for trial. The petitioner raises three arguments in regard to the court's analysis of prejudice, namely, that (1) the habeas court misapplied the factors outlined in *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987), to this case, (2) he was prejudiced by his trial counsel's failure to litigate adequately the joinder issue regarding his compelling need to testify in the case involving G and his equally compelling need to refrain from testifying in the case involving J, and (3) the court failed to consider that, had the issue been litigated at the petitioner's criminal trial, he would have prevailed in his direct appeal. Because we conclude that the evidence in both cases was cross admissible, these argu-

ments are not persuasive.

The following additional facts are relevant to this claim. The petitioner's trial counsel, Attorney D'Amato, "did not file an objection to the state's motion for joinder between December, 2009, when the state filed it, and September, 2011, the time of the [petitioner's] trial. In addition . . . the parties discussed the motion both in chambers and before the court. In chambers . . . [Attorney D'Amato] had suggested that there would not be a lot of argument regarding the motion. Then, when the court heard the parties on the motion, [Attorney D'Amato] expressly stated that there was no objection to the motion. After the court granted the motion, [Attorney D'Amato] did not indicate any disagreement with the court's decision. For the remainder of the consolidated trial, [Attorney D'Amato] did not raise the issue of joinder." (Footnote omitted; internal quotation marks omitted.) *State* v. *Cancel*, supra, 149 Conn. App. 101. As a result of the foregoing, this court concluded in the petitioner's direct appeal that he had "waived any constitutional claims he may have had regarding the joinder." Id., 102.

During the petitioner's habeas trial, Attorney D'Amato recalled that she had researched the joinder issue and concluded that there was no good faith basis to challenge joinder because the law at the time provided that the evidence in both cases would have been cross admissible.[4] In addition, it was established during the habeas proceeding that, after his semen was found on G's underwear, the petitioner had told Attorney D'Amato that he had masturbated and used G's underwear to clean himself. Attorney D'Amato testified that no other evidence could provide an explanation for the presence of the petitioner's semen on G's underwear, and that, if G's and J's cases against the petitioner were not joined, it would have been important to allow the petitioner to provide his explanation during G's case. Attorney D'Amato also testified that, in regard to J's case, the petitioner did not want to testify, she did not want the petitioner to testify for fear of him being charged with perjury, and that, in her experience, having an interpreter involved, as would have been necessary during the petitioner's testimony, would have made the petitioner appear insincere. Finally, Attorney D'Amato did not recall whether the petitioner's alleged desire to testify regarding how his semen got on G's underwear, but his desire not to testify in J's case, provided an argument to challenge joinder.

The habeas court relied on the factors set forth in *State* v. *Boscarino*, supra, 204 Conn. 722–24,[5] and concluded that the petitioner failed to prove prejudice as to his joinder claim. Specifically, the court concluded that both cases had distinguishable fact patterns involving two different victims, alleged similar sexual misconduct involving minors, were not so violent or brutal as

to impair the jury's ability to consider the charges against the petitioner in a fair manner, and that the joint trial was neither lengthy nor complex.

We begin by setting forth the legal principles relevant to the issue of joinder. "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise. . . . [Our Supreme Court] has recognized, however, that improper joinder may expose a defendant to potential prejudice for three reasons: First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all." (Citation omitted; internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 374–75, 852 A.2d 676 (2004).

At the time of the petitioner's trial, a clear presumption in favor of joinder and against severance existed. See id., 375. In *State* v. *Payne*, 303 Conn. 538, 549–50, 34 A.3d 370 (2012), however, our Supreme Court rejected the presumption in favor of joinder and established the following burden of proof with respect to joinder: "[W]hen charges are set forth in separate informations, presumably because they are not of the same character, and the state has moved in the trial court to join the multiple informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced pursuant to the *Boscarino* factors." (Footnote omitted; internal quotation marks omitted.)[6] Importantly, "although our Supreme Court rejected the presumption in favor of joinder, the court did not alter the remainder of the substantive law that Connecticut courts apply when determining whether joinder is appropriate." *Rogers* v. *Commissioner of Correction*, 143 Conn. App. 206, 212, 70 A.3d 1068 (2013).

In determining whether joinder is appropriate, it is well established that where the evidence in one case is cross admissible at the trial of another case, the

defendant will not be substantially prejudiced by joinder. See *State* v. *Crenshaw*, 313 Conn. 69, 83–84, 95 A.3d 1113 (2014) ("[when] evidence of one incident can be admitted at the trial of the other [incident] . . . the defendant [will] not ordinarily be substantially prejudiced by joinder of the offenses for a single trial" [internal quotation marks omitted]); *State* v. *Payne*, supra, 303 Conn. 549–50 ("[T]he state bears the burden of proving that the defendant will not be substantially prejudiced by joinder . . . . The state may satisfy this burden by proving . . . that the evidence in the cases is cross admissible . . . ." [Citation omitted.]); *State* v. *Sanseverino*, 287 Conn. 608, 628–29, 949 A.2d 1156 (2008) ("[w]e consistently have found joinder to be proper if we have concluded that the evidence of other crimes or uncharged misconduct would have been cross admissible at separate trials"), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 437, 953 A.2d 45 (2008), and superseded in part on other grounds after reconsideration by *State* v. *Sanseverino*, 291 Conn. 574, 579, 969 A.2d 710 (2009). Our case law is clear that a court considering joinder need not apply the *Boscarino* factors if evidence in the cases is cross admissible. As such, we do not consider the habeas court's application of the *Boscarino* factors and instead conclude that the petitioner was not prejudiced by his counsel's alleged ineffective performance in regard to joinder because the state would have been able to prove that the evidence in both cases was cross admissible.[7]

At the time of the petitioner's criminal trial, our Supreme Court already had recognized "a *limited* exception to the prohibition on the admission of uncharged misconduct[8] evidence in *sex crime* cases to prove that the defendant had a propensity to engage in aberrant and compulsive criminal sexual behavior." (Emphasis in original; footnote added.) *State* v. *DeJesus*, 288 Conn. 418, 470, 953 A.2d 45 (2008). Generally, in order for the state to introduce any uncharged sexual misconduct evidence against a defendant charged with sex crimes, the state must first demonstrate that such evidence "is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged. . . . [E]vidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the prosecuting witness. . . .

"Second, evidence of uncharged misconduct is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission. . . . In balancing the probative value of such evidence against its prejudicial effect, however, trial courts must be mindful of the purpose for which the evidence

is to be admitted, namely, to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity.

"Lastly, to minimize the risk of undue prejudice to the defendant, the admission of evidence of uncharged sexual misconduct under the limited propensity exception adopted herein must be accompanied by an appropriate cautionary instruction to the jury." (Citations omitted; internal quotation marks omitted.) Id., 473–74.

In the present case, the crimes involving J and G were not too remote in time. J reported her sexual assault in February, 2009, and G reported several instances similar to what J had reported during the relatively short time the petitioner resided in the home. *State* v. *Cancel*, supra, 149 Conn. App. 88–90. Moreover, in both cases, the petitioner was, with the exception of the charge of sexual assault in the first degree in regard to J, accused of committing the same crimes, in the same manner and location, upon the two female minors. See id. Both J and G made statements that the petitioner had come into their rooms alone, and both cases included evidence that the victims had found holes in their underwear and that the holes had appeared during the time the petitioner lived at the mother's residence. In addition, because of the similarity of the evidence in both cases, evidence from one case that may have been introduced in the other would have been unlikely to arouse the jurors' emotions. See *State* v. *James G.*, 268 Conn. 382, 400, 844 A.2d 810 (2004) (evidence of sexual abuse less likely to unduly arouse jurors' emotions when similar evidence has already been presented to jury).

Finally, although it was not necessary for the court to provide the jury with an instruction regarding the proper use of prior misconduct evidence relating to J or G because the cases were joined, the court did provide the jury with an instruction regarding the proper use of prior misconduct evidence relating to the petitioner's previous sexual assault conviction. Specifically, the court stated in its charge to the jury: "Now, other misconduct. In a criminal case in which the defendant is charged with a crime . . . exhibiting [aberrant] and compulsive criminal sexual behavior, evidence of the defendant's commission of another offense is admissible and may be considered for its bearing on any matter to which it is relevant. . . .

"Now, with regard to [the petitioner's previous conviction], evidence of that offense on its own is not sufficient to prove the [petitioner] guilty of the crime charged in the information. . . . It's very important that you keep that in mind. . . .

"The [previous conviction] is offered to show that the [petitioner] had an unusual disposition, that is, a

sexual interest in children. . . . Now, that's all you can use it for . . . . [The conviction] is claimed evidence of a motive for the crime."

The foregoing instructions to the jury were appropriate in the context of the petitioner's criminal trial, and would also have been appropriate had the cases involving J and G not been joined. As such, even if the cases involving J and G had not been joined, the evidence in one case would have been admissible in the other to prove that the petitioner had a propensity or a tendency to sexually assault adolescent girls.

With this in mind, the remaining arguments that the petitioner makes on appeal in regard to joinder are unpersuasive. The petitioner's argument that he had a compelling need to testify in the case involving G, but did not have a similar need to testify in the case involving J, is belied by the fact that the evidence in both cases was cross admissible. Specifically, the evidence that the petitioner's semen was found on G's underwear could have been introduced in J's case. As such, the petitioner's purported need to testify in G's case to explain how his semen got on her underwear similarly would be needed in J's case.

Additionally, the petitioner's contention that the proper argument and preservation of the joinder issue at his criminal trial would have led to a more favorable outcome in his direct appeal must also be rejected. Because the evidence, as previously described, was cross admissible, there was no likelihood that the petitioner's conviction would have been reversed on direct appeal, even if Attorney D'Amato had objected on the grounds that the petitioner now argues on appeal.

On the basis of the foregoing, we conclude that there is no reasonable probability that an objection to joinder would have changed the outcome of the petitioner's criminal trial.

II

The petitioner next claims that the habeas court erred in concluding that his trial counsel had not provided ineffective assistance in failing to object to opinion testimony from a witness on an ultimate issue of fact with respect to the criminal charges in one of the underlying criminal cases. Specifically, the petitioner claims that he was prejudiced by Attorney D'Amato's failure to object to Knapp's testimony in which Knapp expressed her opinion that G was a victim of sexual assault. The petitioner argues that this testimony unfairly gave rise to an inference that he was guilty of sexual assault. The respondent, the Commissioner of Correction, argues that the habeas court properly determined that the petitioner had failed to prove that he was prejudiced in light of the substantial circumstantial evidence admitted at trial. We agree with the respondent that the petitioner failed to demonstrate prejudice.[9]

The following additional facts are relevant to this claim. During the state's redirect examination of Knapp, the prosecutor questioned Knapp about her experience in conducting forensic interviews with children in child sexual assault cases. Subsequently, the following exchange occurred:

"[The Prosecutor]: . . . The defense attorney asked you what was in your mind as to whether or not [G] was a victim . . . do you remember those questions?

"[Knapp]: Yes, I do.

"[The Prosecutor]: Now, [G] never says that the [petitioner] did something bad to her, undisputed. Right?

"[Knapp]: That is correct.

"[The Prosecutor]: But in terms of . . . whether or not [G] was a victim, does the fact that the [petitioner] was convicted of having sexual intercourse with a fourteen year old back in 2002 . . . does that inform your thinking about whether or not [G] was a victim?

"[Knapp]: Yes it does.

"[The Prosecutor]: Okay. And how about the fact that [G's] sister, J, had said, I woke up and somebody was cutting my underwear, the [petitioner], and he put his penis through the hole and then [J] felt wet in [her] butt. Does that inform your thinking as to whether or not [G], who may not know it, is a victim?

"[Knapp]: Yes.

"[The Prosecutor]: And how about the fact that when you go to the house there's all these pairs of underwear with holes cut in the crotch and crop—cut into the butt area and . . . the [petitioner's] semen's in a bunch of those holes; does that inform your thinking as to whether or not you thought [G] was a victim?

"[Knapp]: Yes, the totality of it all was very concerning.

"[The Prosecutor]: As you sit here right now, do you think that [G] was a victim?

"[Knapp]: My personal opinion?

"[The Prosecutor]: That's what you were asked about.

"[Knapp]: Yes

"[The Prosecutor]: Any—

"[Knapp]: —I do.

"[The Prosecutor]: —doubt? Well, I shouldn't ask that. Okay. That's it. Thank you."

The habeas court concluded that the petitioner failed to establish that he was prejudiced by Attorney D'Amato's failure to object to Knapp's testimony without deciding whether that failure constituted deficient performance.[10] The court found that there was substan-

tial evidence against the petitioner in the underlying criminal case apart from Knapp's testimony. We agree.

In the present case, Knapp was repeatedly questioned during the state's redirect examination regarding whether she believed G was a victim. The petitioner argues that Knapp's testimony was unduly prejudicial because there was no direct evidence of abuse in the case involving G. This argument is similar to that made by the petitioner in his direct appeal before this court. In that appeal, the petitioner raised an insufficiency of the evidence claim and argued that the evidence in G's case "merely establishe[d] that at some point G wore the underwear, at some point a hole was cut in them, and that at some point the [petitioner's] semen was wiped on the underwear. In addition, the [petitioner] contend[ed] that [i]t is only after the state implores the jury to consider J's independent . . . testimony, together with the [evidence of the petitioner's prior misconduct] from ten years earlier, that the state is able to prevail with an argument . . . that the [petitioner] *must have* had sexual contact with G." (Emphasis in original; internal quotation marks omitted.) *State* v. *Cancel*, supra, 149 Conn. App. 96–97. This court rejected the petitioner's claim and concluded that, in light of the evidence presented at trial, "the jury reasonably could have inferred that the [petitioner] entered G's bedroom at night and cut holes in her underwear for purposes of sexual gratification, just as he did with J. . . . It also was reasonable for the jury to infer that the [petitioner], when he cut holes in the area of G's underwear corresponding to her intimate parts, made sexual contact with G's intimate parts for the purposes of sexual gratification. . . . Moreover, the jury reasonably could have inferred that either depositing semen on a child's underwear or entering a child's bedroom as she slept at night for purposes of cutting [holes in] her underwear constituted a situation likely to impair the morals of a child." (Citations omitted.) Id., 98.

After reviewing the record, we conclude that, apart from Knapp's testimony, there was overwhelming evidence against the petitioner in the underlying criminal case involving G. "It is the province of the jury to draw reasonable and logical inferences from the facts proved. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . There is no distinction between direct and circumstantial evidence as far as probative force is concerned." (Citations omitted.) *State* v. *Perez*, 183 Conn. 225, 227, 439 A.2d 305 (1981). The jury reasonably could have relied on the statements by both J and G, the DNA analysis that revealed the presence of the petitioner's semen on the inside and outside of G's underwear and clothing, the numerous pairs of G's underwear and pants with holes that had been cut by a sharp object between the rear end and genital area, the independent

testimony from J that indicated she also had holes in her underwear, and the videotape of J's forensic interview, to conclude that the petitioner had sexually assaulted G just as he did with J. Moreover, even if the cases involving G and J had not been joined, as previously discussed in part I of this opinion, the evidence in both cases was cross admissible as evidence that the petitioner had a propensity to engage in the sexual conduct with which he was charged.

Accordingly, because there was no reasonable probability that, had Attorney D'Amato successfully objected to Knapp's alleged opinion testimony that G was a victim of sexual assault, the result of the proceeding would have been different, we conclude that the petitioner failed to prove that he was prejudiced.

### III

The petitioner next claims that the habeas court erred in concluding that Attorney D'Amato had provided effective assistance despite failing to present expert testimony that could have offered an alternative innocent explanation for the sexual assault allegations against him. Specifically, the petitioner claims that Attorney D'Amato's failure to consult with a forensic psychologist regarding the suggestive influence that may have been present in J's forensic interview, particularly in light of J's developmental issues and the ongoing custody dispute between J's mother and uncle, constituted deficient performance by which he was prejudiced. The respondent argues that the petitioner failed to prove that Attorney D'Amato's performance was deficient and that he suffered prejudice. We agree with the respondent.

The following additional facts are relevant to this claim. During the petitioner's criminal trial, Knapp testified regarding her initial conversation with J at the Waterbury police station prior to J's forensic interview. From her initial observation, Knapp became aware of J's developmental issues. In obtaining information from children, the Waterbury Police Department's guidelines called for conducting forensic interviews with children between the ages of three and nine, and typically taking statements from children aged ten and older. Although J was eleven years of age at the time of her complaint, Knapp believed that a forensic interview was necessary for J because of concerns with her cognitive abilities. During their initial conversation, J had stated to Knapp, without prodding, that the reason she was there was because the petitioner had touched her where he was not supposed to. The conversation lasted for approximately twenty-five minutes to one-half hour, and the information that Knapp gleaned from J was consistent with what Knapp had learned from other individuals.

Knapp also testified as to the Waterbury Police Department's general guidelines in conducting forensic

interviews and as to how J's interview was conducted. The forensic interview consisted of nonleading, nonsuggestive questions in a one-on-one environment. The interview was conducted in a specialized room within a facility that specializes in the behavioral health of children and families. The forensic interviewer was a child interview expert with the Waterbury Child Abuse Interdisciplinary Team, which oversaw sexual assault cases in the area. The interviewer and J were alone in the room while law enforcement officials, including Knapp, and department officials watched the interview from the other side of a one-way mirror. The interview was videotaped and audiotaped, which was standard practice. Knapp also testified that she spoke with J's mother on the day following the forensic interview, and that she had provided information that was consistent with information that had been elicited during the forensic interview.

During the habeas trial, Attorney D'Amato testified that she did not consult with any expert witnesses in preparation for the petitioner's criminal trial, and that she knew J had developmental issues and was enrolled in special education classes. Attorney D'Amato had reviewed J's forensic interview, but did not consider consulting with a forensic expert because it did not seem necessary given the overwhelming evidence against the petitioner, including the petitioner's previous criminal history, the scissor cut holes in the underwear, evidence of the petitioner's semen on G's underwear, and the independent statements from J and G. Attorney D'Amato also had understood the role of suggestibility in child sexual assault cases, and recalled that she had seen J's forensic interview several times and that it did not seem to be suggestive or violate any forensic interviewing protocols. Attorney D'Amato also recalled that at the time of the petitioner's trial there had been a custody dispute between J's mother and uncle for custody of J.

The petitioner also presented the expert testimony of Nancy Eiswirth, a forensic psychologist. Dr. Eiswirth defined the concept of suggestibility and how it relates to children, and described how individuals with lower IQs tend to be more suggestible than others. Dr. Eiswirth testified that, generally, suggestibility is relevant in the context of child allegations of sexual assault because it helps with understanding how an allegation came about. Specifically, a review of any preforensic interview contacts that a child may have had is critical to judging whether a question in an interview is leading. Additionally, there is a tendency, particularly among children with low IQs, to want to please or agree with others, or to just answer a question even if they do not understand it. Dr. Eiswirth also reviewed J's forensic interview. Dr. Eiswirth found that J's statements during her forensic interview regarding what may have happened when J was asleep were important because a

child may misinterpret what happens when that child is asleep or in a dream state. Dr. Eiswirth also testified that there was not much questioning during J's forensic interview about people she talked to, but acknowledged that J had stated that she talked to her uncles, her grandmother, and her mother, in addition to other people. Dr. Eiswirth referenced several times that, during the forensic interview, J had exhibited behavior that indicated that she was trying to please the interviewer. Dr. Eiswirth did not recall any questions that would have ruled out suggestibility. Dr. Eiswirth noted several instances that could have been indicative of suggestion, such as J going to her sister's room and talking to her sister, and then subsequently speaking with the department worker. Dr. Eiswirth, however, did not make a determination about J's level of suggestibility.

The habeas court concluded that Attorney D'Amato's failure to present testimony from a mental health expert at the petitioner's criminal trial did not constitute deficient performance and that the petitioner had failed to prove that he was prejudiced by such failure.

"[J]udicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . In reconstructing the circumstances, a reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . ." (Internal quotation marks omitted.) *Bennett* v. *Commissioner of Correction*, 182 Conn. App. 541, 556–57, 190 A.3d 877, cert. denied, 330 Conn. 910, 193 A.3d 50 (2018).

Our Supreme Court has declined to adopt a bright line rule that defense counsel must present an expert witness in every sexual assault case. See *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 100–101, 52 A.3d 655 (2012). Moreover, this court has held in cases involving child sexual assault that trial counsel's decision not to present expert witness testimony in support of an alternative innocent explanation does not necessarily constitute deficient performance when part of a legitimate and reasonable defense strategy. See *Ricardo R.* v. *Commissioner of Correction*, 185 Conn. App. 787, 798, 198 A.3d 630 (2018), cert. denied, 330 Conn. 959, 199 A.3d 560 (2019); *Grover* v. *Commis-*

*sioner of Correction*, 183 Conn. App. 804, 821, 194 A.3d 316, cert. denied, 330 Conn. 933, 194 A.3d 1196 (2018).

On the basis of our review of the record and relevant case law, we are not persuaded that Attorney D'Amato's decision not to present testimony from an expert witness constituted deficient performance. She was aware of J's developmental issues and of the role that suggestibility could have in child sexual assault cases. After reviewing the videotape of the forensic interview several times and finding no suggestibility present, however, she determined that there was no legitimate reason to retain an expert or pursue a suggestibility defense strategy because of the overwhelming evidence against the petitioner. She found, rather, that the best strategy at trial was to focus on the defense that the petitioner had not sexually assaulted or penetrated anyone, and noted that the defense had obtained a not guilty verdict on the charge of attempt to commit sexual assault in the first degree.

Additionally, although Dr. Eiswirth provided testimony on suggestibility in general and on the potential for suggestibility in J's forensic interview, she did not make a determination that J was influenced during the interview or that the interview was improperly conducted. Rather, as demonstrated by Knapp's testimony at the petitioner's criminal trial, the interview conformed to guidelines specified by the Waterbury Police Department and was conducted in an impartial manner by an expert in child sexual assault interviews. The information obtained from the interview also was consistent with information that Knapp had obtained from other witnesses. As such, the petitioner has failed to overcome the presumption that Attorney D'Amato's decision not to present the testimony of an expert, in light of the other evidence presented, fell within the wide range of reasonable professional assistance. See *Ricardo R.* v. *Commissioner of Correction*, supra, 185 Conn. App. 800 ("it was incumbent upon the petitioner to overcome the presumption that, under the circumstances, [counsel's] decision not to consult with an expert was done in the exercise of reasonable professional judgment").

Accordingly, we conclude that Attorney D'Amato's decision not to present testimony from an expert in forensic psychology, in pursuit of a theory of suggestibility that supported a not guilty verdict, did not constitute deficient performance. As such, we need not reach the prejudice prong as to this claim.

IV

Finally, the petitioner claims that the habeas court improperly concluded that his right to the effective assistance of counsel was not violated due to Attorney D'Amato's absence from the petitioner's presentence investigation interview with a probation officer, who

thereafter prepared a report for the trial court. Specifically, the petitioner claims that his counsel's allegedly improper absence from the interview constituted deficient performance and that he was prejudiced because he had made harmful comments during the interview that his counsel, if present, would have advised him not to make and which adversely affected the subsequent sentence handed down by the court. The petitioner also claims that prejudice should be presumed because the presentence investigation interview is a critical stage of the proceedings, and his counsel's absence constituted a complete denial of his right to effective assistance of counsel under the sixth amendment. Because we conclude that the presentence investigation interview is not a critical stage of a criminal proceeding, the petitioner was not entitled to the effective assistance of counsel during this interview and, accordingly, we agree with the habeas court's rejection of this claim, albeit on alternate grounds.

Attorney D'Amato provided uncontroverted testimony that she inadvertently was absent from the petitioner's presentence investigation interview because she had gotten lost on her way to MacDougall-Walker Correctional Institution, where the interview took place. During the petitioner's sentencing, however, Attorney D'Amato indicated that she and the petitioner had discussed the interview and that she had reviewed the presentence investigation report. Moreover, Attorney D'Amato asked the court to strike any denials that she believed the petitioner may have made during the interview because she had not been present, even though the petitioner had informed her that he did not make any statements about what had happened during the presentence investigation interview.[11] The court did not act on Attorney D'Amato's request or refer to the petitioner's presentence investigation report during sentencing.

After analyzing the petitioner's claims under *Strickland* v. *Washington*, supra, 466 U.S. 687, the habeas court found that trial counsel's absence from the petitioner's presentence investigation interview did not constitute deficient performance and that the petitioner failed to prove prejudice.

A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all *critical stages* of a criminal proceeding. See id., 686; see also *Gonzalez* v. *Commissioner of Correction*, 308 Conn. 463, 470, 68 A.3d 624 (2013). As previously discussed, "[u]nder the two-pronged *Strickland* test, a [petitioner] can only prevail on an ineffective assistance of counsel claim if he proves that (1) counsel's performance was deficient, and (2) the deficient performance resulted in actual prejudice. . . . To demonstrate deficient performance, a [petitioner] must show that counsel's conduct fell below an objective standard of

reasonableness for competent attorneys. . . . To demonstrate actual prejudice, a [petitioner] must show a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors. . . .

"*Strickland* recognized, however, that [i]n certain [s]ixth [a]mendment contexts, prejudice is presumed. . . . In . . . [*United States* v. *Cronic*, 466 U.S. 648, 659–60, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)] . . . which was decided on the same day as *Strickland*, the United States Supreme Court elaborated on the following three scenarios in which prejudice may be presumed: (1) when counsel is denied to a [petitioner] at a critical stage of the proceeding; (2) when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) when counsel is called upon to render assistance in a situation in which no competent attorney could do so. . . . This is an irrebuttable presumption." (Citation omitted; internal quotation marks omitted.) *Edwards* v. *Commissioner of Correction*, 183 Conn. App. 838, 843–44, 194 A.3d 329 (2018). In *Cronic*, the court reasoned that such situations indicate that "there has been a denial of [s]ixth [a]mendment rights that makes the adversary process itself presumptively unreliable." *United States* v. *Cronic*, supra, 659.

Our case law has recognized that, once the *Cronic* presumption of prejudice applies, a petitioner has asserted a valid claim of ineffective assistance of counsel and his claim for relief under *Strickland* need not be addressed. See *Davis* v. *Commissioner of Correction*, 319 Conn. 548, 568, 126 A.3d 538 (2015), cert. denied sub nom. *Semple* v. *Davis*, U.S. , 136 S. Ct. 1676, 194 L. Ed. 2d 801 (2016); *Edwards* v. *Commissioner of Correction*, supra, 183 Conn. App. 839 n.1. In *Davis*, our Supreme Court distinguished the effective assistance of counsel analyses done under *Strickland* and *Cronic*. *Davis* v. *Commissioner of Correction*, supra, 556. Specifically, the court reasoned that "specific errors in representation, for which counsel can provide some reasonable explanation, are properly analyzed under *Strickland*," while "[c]ounsel's complete failure to advocate for a defendant . . . such that no explanation could possible justify such conduct," warrants the application of *Cronic*'s presumption of prejudice. Id. The court then turned to the merits of the claim of ineffective assistance before it and conducted an analysis under *Cronic* after concluding, in the habeas context, that a complete breakdown in the adversarial process had occurred. Id., 560–61. Although *Cronic* has been appropriately applied in this manner, our state jurisprudence has recognized that *Cronic* must be interpreted narrowly and applied rarely. See *Taylor* v. *Commissioner of Correction*, 324 Conn. 631, 649, 153 A.3d 1264 (2017).

In the present case, the petitioner claims that Attorney D'Amato's failure to attend the presentence investigation interview constituted a complete breakdown in the adversarial process, as it effectively deprived him of counsel at a critical stage of his criminal proceeding. Thus, he argues that his claim should be reviewed under *Cronic*'s presumption of prejudice. As such, in order to determine whether *Cronic*'s presumption of prejudice applies in this case, we necessarily must determine whether the presentence investigation interview is a critical stage.

"The central question in determining whether a particular proceeding is a critical stage of the prosecution focuses on whether potential substantial prejudice to the [petitioner's] rights inheres in the . . . confrontation and the ability of counsel to help avoid that prejudice." (Internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, supra, 308 Conn. 479–80. Connecticut courts have not yet considered whether a presentence investigation interview is a critical stage of a criminal proceeding. The petitioner urges this court to rely on the decision of the Vermont Supreme Court in *In re Carter*, 176 Vt. 322, 349, 848 A.2d 281 (2004), which held that presentence investigation interviews are a critical stage. In contrast, the respondent points to a plethora of case law, both state and federal, in which courts have either held that a presentence investigation interview in a noncapital case is not a critical stage or declined to determine that it is. See, e.g., *United States* v. *Archambault*, 344 F.3d 732, 736 n.4 (8th Cir. 2003) (noting that sixth amendment does not apply when defendant voluntarily participated in presentence investigation and that no court has found that sixth amendment right applies to routine presentence interviews); *United States* v. *Tyler*, 281 F.3d 84, 96 (3d Cir. 2002) (same); *United States* v. *Tisdale*, 952 F.2d 934, 939–40 (6th Cir. 1992) ("[b]ecause the probation officer does not act on behalf of the prosecution . . . a presentence interview in a non-capital case is not a critical stage . . . ." [internal quotation marks omitted]); *United States* v. *Hicks*, 948 F.2d 877, 885–86 (4th Cir. 1991) (sentencing judges exercise independent discretion in determining defendant's sentence and denial of counsel in this context is constitutionally insignificant); *United States* v. *Cortez*, 922 F.2d 123, 128 (2d Cir. 1990) (even assuming sixth amendment extends to presentence interview, sixth amendment not violated where defendant did not claim counsel was excluded from interview or that defendant was forced to proceed without counsel); *State* v. *Kauk*, 691 N.W.2d 606, 608–10 (S.D. 2005) (defendant's right to counsel not violated where counsel was absent from presentence interview); *People* v. *Cortijo*, 291 App. Div. 2d 352, 352, 739 N.Y.S. 2d 19 (presentence interview does not constitute stage of proceedings at which right to counsel attaches), leave to appeal denied, 98 N.Y.2d 674, 774 N.E.2d 228, 746

N.Y.S.2d 463 (2002).

The cases that recognize that the sixth amendment does not apply to presentence interviews place an emphasis on the voluntary nature of such interviews, the sentencing judge's independent discretion in sentencing, and the probation officer's role in sentence determination. *In re Carter*, supra, 176 Vt. 348, distinguished itself from many of these cases by pointing out that in the federal system, the probation officer is an employee of the judicial branch, while in the Vermont system, the probation officer who prepares the report is an employee of the executive branch. Id. The court reasoned that, unlike in the Vermont system, a probation officer in the federal system "is insulated from political pressure and answers to no one but the sentencing judge." Id. Moreover, in concluding that presentence interviews are a critical stage of the sentencing process, *In re Carter* held that the right to counsel is not limited to adversary proceedings. Id. In reaching this decision, *In re Carter* states that "no [United States] Supreme Court decision supports the rationale . . . that the right to counsel is limited to proceedings with an adversary character"; (internal quotation marks omitted) id., 346; and notes that federal case law's reliance on *Kirby* v. *Illinois*, 406 U.S. 682, 690, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972), for the proposition that a proceeding must have an adversarial character to be a critical stage is misplaced. *In re Carter*, supra, 346 n.4.

We are not persuaded that the right to counsel at a critical stage extends to nonadversarial proceedings. According to *Kirby* v. *Illinois*, supra, 406 U.S. 689–90, a critical stage of a criminal proceeding, or one in which the sixth amendment right to counsel applies, occurs when "the defendant finds himself faced with the prosecutorial forces of an organized society, and immersed in the intricacies of substantive and procedural criminal law." Id., 689. On the basis of this language, it necessarily follows that a proceeding must be adversarial in nature in order to be considered a critical stage.

Courts that have considered the issue of whether a defendant's sixth amendment right to counsel applies during a presentence interview have concluded that, "[b]ecause [a] probation officer does not act on behalf of the prosecution . . . a presentence interview in a non-capital case is not a critical stage within the meaning of *Kirby*." (Internal quotation marks omitted.) *United States* v. *Tisdale*, supra, 952 F.2d 939; *United States* v. *Woods*, 907 F.2d 1540, 1543 (5th Cir. 1990), cert. denied, 498 U.S. 1070, 111 S. Ct. 792, 112 L. Ed. 2d 854 (1991); *United States* v. *Jackson*, 886 F.2d 838, 844–45 (7th Cir. 1989); see also *In re Carter*, supra, 176 Vt. 346. As such, whether a presentence interview is an adversarial proceeding and, thus, a critical stage, largely appears to rest on the role of the probation officer in conducting the interview and whether the officer acts

independently of the prosecuting authority. In Connecticut, trial courts enlist the aid of probation officers to investigate and make a report prior to sentencing. See *State* v. *Nacsin*, 23 Conn. Supp. 214, 218–19, 180 A.2d 643 (1962) ("The trial court properly enlisted the aid of the family relations officer to make an investigation and report prior to the imposition of sentence. . . . There is a wide field open to the trial judge in obtaining information, after conviction, relevant to mitigation or aggravation of the seriousness of the offense." [Citation omitted; internal quotation marks omitted.). "The sole purpose [of a presentence investigation] is to enable the court, within limits fixed by statute, to impose an appropriate penalty, fitting the offender as well as the crime." (Internal quotation marks omitted.) *State* v. *Patterson*, 236 Conn. 561, 574, 674 A.2d 416 (1996). Moreover, under both federal and Connecticut law, "*a probation officer acts as an arm of the court*" in preparing and submitting presentence reports. (Internal quotation marks omitted.) *Peay* v. *Ajello*, 470 F.3d 65, 69 (2d Cir. 2006).

On the basis of the foregoing, we conclude that there was no denial of the petitioner's sixth amendment right to counsel during his presentence investigation interview. We agree with the weight of authority that holds that a presentence investigation interview is not a critical stage of a criminal proceeding because, as in the federal system, a Connecticut probation officer is an extension of the court and not an agent of the government. Compare *United States* v. *Jackson*, supra, 886 F.2d 844, with *Peay* v. *Ajello*, supra, 470 F.3d 69. Moreover, like federal courts, Connecticut courts exercise broad, independent discretion in imposing a sentence. See *State* v. *Patterson*, supra, 236 Conn. 575 ("[c]ourts . . . are afforded equally broad discretion in imposing a sentence when a [presentence investigation report is] provided"); *State* v. *Nacsin*, supra, 23 Conn. Supp. 219 ("[t]he trial court was not obliged to follow the recommendation of the family relations officer contained in the report concerning the sentences to be imposed by the court, and the failure to do so is not an abuse of discretion"). As such, we conclude that the presentence investigation interview is not a critical stage of a criminal proceeding, and, thus, do not presume prejudice as a result of Attorney D'Amato's absence from the petitioner's interview.[12]

Accordingly, because we have concluded that the presentence investigation interview is not a critical stage of the petitioner's criminal proceeding to which the petitioner's sixth amendment right to counsel applies, he is not entitled to relief for any alleged ineffectiveness of his trial counsel during the interview.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the

victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[2] The petitioner initially was arrested on the charges stemming from J's case. On August 5, 2009, after further police investigation, the petitioner was arrested on charges stemming from G's case.

[3] On appeal, the petitioner did not raise in his brief the claims relating to: inadequate research, investigation, or education; cross-examination, impeachment, or challenging of the testimony of J, G, or their uncle; pursuit of the production and disclosure of confidential and privileged materials related to J; or the presentation of evidence of a custody dispute between J's mother and J's uncle. Accordingly, these claims are deemed to be abandoned. See *Walker* v. *Commissioner of Correction*, 176 Conn. App. 843, 856–57, 171 A.3d 525 (2017).

[4] If evidence of one incident can be admitted at the trial of another incident, such evidence is said to be cross admissible. See *State* v. *LaFleur*, 307 Conn. 115, 155, 51 A.3d 1048 (2012); *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987).

[5] In *State* v. *Boscarino*, supra, 204 Conn. 722–24, our Supreme Court first articulated the factors that a trial court must consider when deciding whether it is appropriate to join two separate yet factually related cases for trial when evidence in the cases are not cross admissible. The court determined that joinder of such cases is unduly prejudicial to the defendant and, thus, improper, if (1) the cases do not involve discrete, easily distinguishable factual scenarios, (2) the crimes in the cases were of a particularly violent nature or concerned brutal or shocking conduct on the defendant's part, and (3) the trial was lengthy and complex. Since that decision, our Supreme Court consistently has applied the *Boscarino* factors in determining when joinder is proper. See *State* v. *Ellis*, 270 Conn. 337, 375–76, 852 A.2d 676 (2004); see also *State* v. *Payne*, 303 Conn. 538, 550, 34 A.3d 370 (2012).

[6] Although our Supreme Court in *State* v. *Payne*, supra, 303 Conn. 550, shifted to the state the burden of proving whether joinder is appropriate in cases in which charges are set forth in separate informations, such as in the present case, the court also noted that this rule of law would not apply retroactively in habeas proceedings. See id., 550 n.10. The petitioner argues, nonetheless, that *Payne* governs the analysis of the issue of joinder that he raised in his direct appeal and, thus, that there was a reasonable probability that, had Attorney D'Amato properly preserved the issue for appellate review, the petitioner's convictions would have been reversed on direct appeal. The petitioner's claim before this court, however, alleges that his trial counsel failed to litigate adequately the joinder issue *at the time of his criminal trial.*

As previously discussed, our case law at the time of the petitioner's criminal trial *recognized a clear presumption in favor of joinder*. See *State* v. *Ellis*, supra, 270 Conn. 375. Attorney D'Amato decided not to object to joinder on the basis of the law as it existed at the time of the petitioner's criminal trial. To conclude, on the basis of *Payne*, that the petitioner was prejudiced by his counsel's alleged failure to adequately litigate the joinder issue at his criminal trial would be tantamount to requiring Attorney D'Amato to have argued legal principles not yet established at the time of that trial. We decline to endorse such a proposition.

[7] This court may sustain a correct decision although it may have been decided on an incorrect ground. See *Tyson* v. *Commissioner of Correction*, 155 Conn. App. 96, 105, 109 A.3d 510, cert. denied, 315 Conn. 931, 110 A.3d 432 (2015).

[8] "Uncharged misconduct refers to the conduct of the accused that is not charged in the information; it refers to the accused's conduct not related to the trial, whether or not charged in another case." E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 4.15.5 (a), p. 173.

[9] The habeas court did not make a finding of fact with respect to the deficient performance prong in this claim. Additionally, neither party makes an argument in their respective briefs before this court regarding the performance prong. Accordingly, we do not address it.

[10] It is well established that "[n]o witness, lay or expert, may testify to his opinion as to the guilt of a defendant, whether by direct statement or reference. . . . In general, [t]estimony is objectionable if it embraces an opinion on the ultimate issue to be decided by the trier of fact. . . . Whether a statement of a witness is one of fact or of conclusion or opinion within the rule excluding opinion evidence is to be determined by the substance of the statement rather than its form. The use of phraseology appropriate

to the expression of an inference, such as believe, think, etc., may in fact signify an opinion which renders the statement inadmissible; but the use of such terms is not conclusive that the witness is stating his opinion, for the language may be used merely to indicate that he is not speaking with entire certainty, in which case the evidence may be received for what it is worth." (Citations omitted; internal quotation marks omitted.) *State* v. *Fuller*, 56 Conn. App. 592, 619–20, 744 A.2d 931, cert. denied, 252 Conn. 949, 748 A.2d 298, cert. denied, 531 U.S. 911, 121 S. Ct. 262, 148 L. Ed. 2d 190 (2000). "An opinion, by definition, consists of [e]vidence of what the witness thinks, believes, or infers in regard to facts in dispute." (Internal quotation marks omitted.) *Hayes* v. *Decker*, 66 Conn. App. 293, 301, 784 A.2d 417 (2001), aff'd, 263 Conn. 677, 822 A.2d 228 (2003).

[11] The denial of guilt that the petitioner claims he made during the presentence investigation interview was not made during that interview, but, rather, during a sex offender evaluation interview that took place in October, 2011, after the petitioner was convicted. A report of the sex offender evaluation interview was provided to the probation officer and included in the presentence investigation report.

[12] Our rules of practice also indicate that counsel's presence at a presentence investigation interview is permitted, not required; see Practice Book § 43-5; and "[o]ur case law establishes . . . that a failure to comply with procedures set forth under the rules of practice or the statutes relating to presentence reports does not necessarily, in and of itself, establish a violation of due process." *State* v. *Parker*, 295 Conn. 825, 846, 992 A.2d 1103 (2010).